# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 03-3058

_____

| | | |
|---|---|---|
| Jamie McCurdy, | * | |
| | * | |
| Plaintiff/Appellant, | * | |
| | * | |
| v. | * | |
| | * | Appeal from the United States |
| Arkansas State Police, | * | District Court for the Eastern |
| | * | District of Arkansas. |
| Defendant/Appellee, | * | |
| | * | |
| State of Arkansas, | * | |
| | * | |
| Defendant. | * | |

_____

Submitted: March 12, 2004
Filed: July 23, 2004

_____

Before RILEY and MELLOY, Circuit Judges, and ERICKSON,[1] District Judge.

_____

RILEY, Circuit Judge.

_____

[1]The Honorable Ralph R. Erickson, United States District Judge for the District of North Dakota, sitting by designation.

This case asks whether an employer is strictly liable for a single incident of supervisor sexual harassment.[2] Jamie McCurdy (McCurdy), an employee of the Arkansas State Police, sued the State of Arkansas and the Arkansas State Police (collectively ASP), alleging the ASP should be vicariously liable under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a)(1) (2000), for the alleged sexual harassment perpetrated against McCurdy by her supervisor on one occasion over a one-hour period. The district court concluded the ASP's prompt remedial response to McCurdy's sexual harassment allegation shielded the ASP from liability: "Where an employer receives an allegation of sexual harassment, and the employer was not previously on notice of the alleged harasser's prior like-conduct or propensity to act, and the employer promptly insulates the complainant from further harassment and promptly investigat[es] the allegations, the employer is entitled to a judgment as a matter of law. Surely this is what Title VII expects of employers."

Accordingly, the district court granted summary judgment in the ASP's favor. McCurdy appeals. Concluding the district court correctly interpreted and applied Title VII and Supreme Court precedent to a case involving a single incident of supervisor sexual harassment, we affirm.

## I.    BACKGROUND

On April 28, 2002, McCurdy began her employment with the ASP as a radio dispatcher in Little Rock, Arkansas. Upon her employment, McCurdy received a copy of the Non-Commissioned Personnel Manual. This manual contains a section prohibiting sexual harassment, which informs employees about the ASP's anti-

[2]The Honorable G. Thomas Eisele, United States District Judge for the Eastern District of Arkansas, determined that, for summary judgment purposes, the alleged harassment was perpetrated by a supervisor. The parties do not dispute this decision on appeal, and the record does not allow us to decide this issue as a matter of law. Therefore, we labor under the assumption the alleged harasser in this case was a supervisor.

harassment policy, prohibited activities, employee's responsibilities, and how to complain about harassment in the workplace. McCurdy was assigned to work the evening shift, which ran from 3:00 p.m. to 11:00 p.m. McCurdy's immediate supervisor did not work the evening shift with McCurdy.

Viewing the evidence in the light most favorable to McCurdy, we glean the following events. On Friday, July 5, 2002, McCurdy worked the evening shift in the ASP Communications Center (Center) with Operators Jeanne Hill (Hill), a female, and Tracy Wilson (Wilson), a male. Several hours into McCurdy's shift, Sergeant Daryl Hall (Sergeant Hall) entered the Center while only McCurdy and Wilson were present. Hill was in another room at that time. McCurdy alleges Sergeant Hall walked into the Center and immediately "cupped, touched, brushed against [McCurdy's] left breast." McCurdy states she "rejected the sexual advances." When she asked Sergeant Hall what he was doing, he responded, "Oh, stop it. You have a hole in your shirt." When McCurdy looked down at her shirt, Sergeant Hall said, "Stop looking at your tits."

Sergeant Hall then sat down and asked McCurdy where her uniform was, to which she responded it was Friday. Sergeant Hall replied, "Well, if I was the Chief, your uniform would be panties and a tank top." McCurdy did not respond. At about this time Hill reentered the Center. At some point, Sergeant Hall positioned his chair next to McCurdy, and then played with and twirled McCurdy's hair. He also asked McCurdy if she "had any black" in her. McCurdy told him her dad is Italian. After McCurdy and Sergeant Hall talked about dispatch duties, McCurdy left the Center to smoke a cigarette. Before McCurdy left the Center, she gave her cellular telephone number to Hill, asking Hill to call her if Sergeant Hall left. McCurdy then called Hill and "kind of briefed her on what had happened," informing Hill she was not returning while Sergeant Hall was in the Center. After ten or fifteen minutes outside, Trooper James Reid (Trooper Reid) arrived, and McCurdy and Trooper Reid went into the Center, knowing Sergeant Hall was still inside.

At that point, McCurdy, Trooper Reid, Wilson, Hill and Sergeant Hall were in the Center. Sergeant Hall then told McCurdy she has "a really sexy voice on the radio. You kind of turn me on." As Sergeant Hall prepared to leave, he hugged McCurdy and Hill. McCurdy contends Sergeant Hall was in the Center "about an hour." After Sergeant Hall left the Center, McCurdy, Hill and Wilson spent about three hours discussing whether McCurdy should report the incident.[3]

McCurdy decided to report Sergeant Hall's behavior, and called Sergeant Shawn Garner (Sergeant Garner), the highest ranking person on duty. When Sergeant Garner arrived around 9:00 p.m., McCurdy told him about Sergeant Hall's conduct. Sergeant Garner called his supervisor, Lieutenant Gloria Weakland (Lieutenant Weakland), at home to notify her about McCurdy's allegations. Lieutenant Weakland "told Garner to ensure that McCurdy and Hall had no contact for the remainder of the weekend." Because McCurdy's shift was ending at 11:00 p.m., and she was not scheduled to work until the following Tuesday, Sergeant Garner assured Lieutenant Weakland that McCurdy would have no contact with Sergeant Hall.

When Lieutenant Weakland arrived at work on Monday, July 8, she informed her supervisor, Captain Carl Kirkland (Captain Kirkland), of McCurdy's allegations. That same day, Captain Kirkland and Lieutenant Weakland interviewed Trooper

---

[3]The district court reported "the July 5 encounter between [McCurdy] and Sergeant Hall was their second meeting." Apparently, McCurdy contended for the first time in her summary judgment brief that Sergeant Hall inappropriately touched her during their first meeting, which McCurdy described as follows: "[McCurdy] first encountered [Sergeant] Hall when he came into the radio room area after [a state trooper] had been killed in an accident. At that time according to [McCurdy], everyone was hugging each other concerning the grief felt for [the trooper]'s death. According to [McCurdy, Sergeant] Hall at that time touched her in an inappropriate manner by pressing against her breast. [McCurdy] gave [Sergeant] Hall the benefit of the doubt at that time because of the circumstances." The district court noted McCurdy presented no evidence that she reported this incident to the ASP.

Reid, Hill, Wilson, Sergeant Hall and McCurdy. Monday was McCurdy's day off, but she still reported to work to talk to Captain Kirkland and Lieutenant Weakland about the allegations. Over the weekend, McCurdy had contacted an attorney, and brought him to work on Monday to meet with ASP management. Wanting to ensure Sergeant Hall and McCurdy did not have contact with each other, Captain Kirkland and Lieutenant Weakland instructed McCurdy's supervisor to assign McCurdy radio duties so she would have no radio contact with Sergeant Hall while he was on patrol.

Instead of conducting their own internal investigation, Captain Kirkland and Lieutenant Weakland reported the allegations to the Special Investigations Unit (a.k.a., Internal Affairs). On July 10, Lieutenant Nathaniel Jackson (Lieutenant Jackson), the officer in charge of the Special Investigations Unit, was assigned to investigate McCurdy's complaints against Sergeant Hall. Also on July 10, McCurdy submitted to Captain Kirkland a two-page memorandum explaining the July 5 incident. On July 11, McCurdy submitted a Police-Citizen Complaint Form.[4] Lieutenant Jackson investigated McCurdy's complaint and delivered a written report to Captain Kirkland on August 5, 2002. In his report, Lieutenant Jackson concluded Sergeant Hall had violated the ASP's Workplace Harassment Policy. On August 5, Captain Kirkland reviewed Lieutenant Jackson's investigative report, and concurred that Sergeant Hall had violated the ASP's Workplace Harassment Policy. Captain Kirkland also concluded Sergeant Hall had violated other ASP Rules of Conduct regarding coarse language and gestures, insubordination, and improper conduct. In an August 5 memorandum to Major J.R. Howard (Major Howard), Division Commander, Captain Kirkland reported these findings, recommending "Sergeant

[4]The ASP's Field Operations Policy and Procedural Manual guides the reporting and investigating of officer misconduct. When a misconduct allegation is made, the complainant is required to document the complaint on a Police-Citizen Complaint Form. After the ASP receives this form, the Special Investigations Unit has thirty days to complete an investigation of the complaint and report to the Division Commander.

[H]all be demoted to the rank of Corporal, . . . seek counseling for his sexually harassing behavior, and . . . be placed on one year probation with his actions closely monitored by the command staff." Captain Kirkland also informed Major Howard that Sergeant Hall had been reassigned from his patrol duties to a daytime desk position so he would have no contact with McCurdy.

Major Howard appointed a Disciplinary Review Board (DRB),[5] which convened on August 29. The DRB interviewed Captain Kirkland, Hill, Wilson, Sergeant Hall and McCurdy. McCurdy told the DRB she felt it was ridiculous she had to wait outside the DRB hearing room in a lobby area also occupied by Sergeant Hall, where he could watch her. She also reported for the first time to the DRB that, while she was working at the Center, she twice received business-related telephone calls from Sergeant Hall after the July 5 incident. Sergeant Hall did not say anything inappropriate during these calls. Because of these newly reported telephone calls, Captain Kirkland and Lieutenant Weakland transferred Sergeant Hall to work Governor Security Detail so he would have no reason to contact the Center or McCurdy. The DRB asked Sergeant Hall for a second polygraph examination and also asked McCurdy to submit to polygraph examination. The polygraph examiner noted McCurdy's response to the question, "Did Sergeant Hall touch your breast?" did not allow the examiner to form an opinion on truthfulness or was inconclusive. On September 10, the DRB found McCurdy's sexual harassment complaint

---

[5]The ASP's Field Operations Policy and Procedural Manual requires that, if an investigating officer recommends discipline, the Division Commander convenes a DRB to consider the matter. A majority of the three-person DRB then recommends the appropriate discipline. Assistant Directors then review the DRB's recommendation. The investigative file, including the recommendations of the DRB and the Assistant Directors, then goes to the Director for review. The Director thereafter renders a final decision. Depending on the nature of the discipline, the officer accused of misconduct may then appeal the Director's decision to the Arkansas State Police Commission (Commission). The Commission can approve, enhance or diminish the discipline against the accused officer.

"unfounded," but found Sergeant Hall violated the ASP's rules on coarse language and gestures, improper conduct, and insubordination/truthfulness. The DRB recommended Sergeant Hall undergo a psychological evaluation to determine his fitness for duty, and, if competent for duty, be demoted to corporal and transferred from his patrol division.

The DRB reported its recommendation to Major Howard, and then the DRB's findings and recommendations were reviewed by Lieutenant Colonel Steve Dozier (Lieutenant Colonel Dozier). On September 16, Lieutenant Colonel Dozier forwarded the DRB's report to Colonel Don Melton (Colonel Melton), the ASP's Director, noting the "ASP Truthfulness Form (ASP-48A) plainly states that an employee will be terminated for knowingly and deliberately lying or making false statements while being questioned during an internal investigation." On September 26, Colonel Melton terminated Sergeant Hall's employment immediately, informing Sergeant Hall in writing that Colonel Melton found Sergeant Hall had violated the ASP's sexual harassment and insubordination/truthfulness policies. Colonel Melton informed Sergeant Hall he had a right to appeal his termination to the Commission.

Sergeant Hall appealed his termination to the Commission. The five-member Commission unanimously overturned Colonel Melton's decision to terminate Sergeant Hall's employment for violating the ASP's policies on sexual harassment and insubordination/truthfulness. Thus, the ASP reinstated Sergeant Hall, but then immediately transferred him to Fort Smith, Arkansas, and demoted him to corporal.

McCurdy sued the ASP for the alleged sexual harassment perpetrated against her by Sergeant Hall. McCurdy has not sued Sergeant Hall, and the record does not indicate McCurdy ever filed criminal charges against Sergeant Hall. McCurdy argues "[s]he was subjected to an incident of harassment when a sergeant came into a radio room, made crude comments to her, and grabbed her breast." The district court held

the ASP could not be vicariously liable for Sergeant Hall's conduct, and granted summary judgment to the ASP based on its entitlement to an affirmative defense.

McCurdy contends the district court misapplied the applicable affirmative defense, while the ASP argues the district court correctly granted the ASP summary judgment based on its affirmative defense. The ASP also contends summary judgment was appropriate, because Sergeant Hall's conduct was not severe or pervasive enough to constitute actionable sexual harassment.

## II.     DISCUSSION
### A.     Standard of Review

We review de novo the district court's grant of summary judgment to the ASP. Mayer v. Nextel West Corp., 318 F.3d 803, 806 (8th Cir. 2003). Summary judgment is proper if the evidence, viewed in the light most favorable to McCurdy and giving her the benefit of all reasonable inferences, shows there are no genuine issues of material fact and the ASP is entitled to judgment as a matter of law. See id.; Fed. R. Civ. P. 56(c).

### B.     Hostile Work Environment

Title VII prohibits an employer from "discriminat[ing] against any individual with respect to h[er] compensation, terms, conditions, or privileges of employment, because of such individual's . . . sex." 42 U.S.C. § 2000e-2(a)(1). Unlawful discrimination based on sex includes claims of hostile or abusive work environment sexual harassment. Meritor Sav. Bank, FSB v. Vinson, 477 U.S. 57, 66 (1986). To establish a hostile work environment claim created by a supervisor, McCurdy must prove "(1) that she is a member of a protected group; (2) that she was subject to unwelcome sexual harassment; (3) that the harassment was based on sex; and (4) that the harassment affected a term, condition, or privilege of employment." Hocevar v. Purdue Frederick Co., 223 F.3d 721, 736 (8th Cir. 2000). Federal sexual harassment standards are demanding, and McCurdy must clear a high threshold to make an

actionable claim requiring federal intervention in her workplace in the State of Arkansas. See Tuggle v. Mangan, 348 F.3d 714, 720-21 (8th Cir. 2003) (citations omitted). Regardless of whether the single incident involving McCurdy and Sergeant Hall meets the high threshold for actionable harm, we conclude the ASP's assertion of an affirmative defense shields it from liability.[6]

Before discussing the Supreme Court's creation of an affirmative defense in supervisor harassment cases, we begin with the crystal clear understanding that Title VII does not hold employers strictly liable for all sexual harassment perpetrated by supervisors. In Meritor, 477 U.S. at 63, the Supreme Court reviewed a D.C. Circuit Court of Appeals decision holding "an employer is absolutely liable for sexual harassment practiced by supervisory personnel, whether or not the employer knew or should have known about the misconduct." The Supreme Court rejected this viewpoint, concluding "the Court of Appeals was wrong to entirely disregard agency principles and impose absolute liability on employers for the acts of their supervisors,

---

[6]Given this fact scenario, some courts might conclude the single incident of Sergeant Hall's harassment was not severe or pervasive to constitute actionable sexual harassment. See, e.g., Clark County Sch. Dist. v. Breeden, 532 U.S. 268, 271 (2001) (holding single incident of sexual harassment, which was not extremely serious, was not actionable under Title VII); Meriwether v. Caraustar Packaging Co., 326 F.3d 990, 993 (8th Cir. 2003) (deciding a single incident of grabbing a co-worker's buttock with force near her upper thigh and later joking about the incident "does not rise to the level of severe or pervasive conduct" to be actionable); Mattson v. Caterpillar, Inc., 359 F.3d 885, 889 (7th Cir. 2004) (finding clearly no sexual harassment "when . . . breast allegedly brushed against his arm on a single occasion" and when the woman reached around claimant without touching). Such a decision avoids the question of employer liability for a single incident of supervisor sexual harassment. Because we conclude the ASP cannot be liable for Sergeant Hall's unauthorized conduct, we decline to address whether Sergeant Hall's conduct on July 5 constitutes actionable sexual harassment. See Burlington Indus., Inc. v. Ellerth, 524 U.S. 742, 754 (1998) (assuming the plaintiff had proved sexual harassment, leaving only the issue of vicarious employer liability).

regardless of the circumstances of a particular case." Id. at 73. The Court made clear "that employers are [not] always automatically liable for sexual harassment by their supervisors." Id. at 72. The Court recognized that Congress wanted courts to consider agency principles when determining employer liability under Title VII. Id. For support, the Court noted "Congress' decision to define 'employer' to include any 'agent' of an employer, 42 U.S.C. § 2000e(b), surely evinces an intent to place some limits on the acts of employees for which employers under Title VII are to be held responsible." Id.

Twelve years after instructing courts not to hold employers strictly liable, and to consider agency principles when determining employer liability for supervisor harassment under Title VII, the Supreme Court confronted two cases involving multiple incidents of supervisor harassment. See Ellerth, 524 U.S. at 746-66; Faragher v. City of Boca Raton, 524 U.S. 775 (1998). The Court recognized that, "[s]ince our decision in Meritor, Courts of Appeals have struggled to derive manageable standards to govern employer liability for hostile environment perpetrated by supervisory employees." Faragher, 524 U.S. at 785. The Court also recognized that its only discussion of a standard for employer liability, in Meritor, "involved a claim of discrimination by a supervisor's sexual harassment of a subordinate over an extended period." Id. at 791. The Supreme Court has never addressed the issue we confront today: an employer's liability for a single incident of sexual harassment perpetrated by a supervisor.[7]

In Ellerth, 524 U.S. at 747-48, a supervisor subjected an employee to near-constant sexual harassment, but the employee never reported the conduct to anyone in authority, although she knew about the employer's anti-harassment policy. Despite the harassing conduct, the employee suffered no tangible employment action. Id. at

[7]Both Ellerth and Faragher involved multiple incidents of supervisor sexual harassment, while McCurdy has alleged only a single incident of harassment.

766. Given these facts, the Court asked whether the employer had vicarious liability for the supervisor's harassment. Id. at 754.

Following Meritor's instruction, the Court once again considered agency principles when determining employer liability for supervisor harassment. Id. at 754-65. The Court initially considered employer liability in the scope-of-employment context, but conceded "[t]he general rule is that sexual harassment by a supervisor is not conduct within the scope of employment." Id. at 757. The Court then addressed other agency principles to determine employer liability: when the employer's negligence causes the harassment (negligence standard); when the supervisor uses apparent authority to harass employees (apparent authority standard); and when the supervisor is aided in the harassment by the agency relation (aided in the agency relation standard). Id. at 759. Given the facts of the case, the Court focused on the aided in the agency relation standard, which "requires the existence of something more than the employment relation itself." Id. at 760. Based on the aided in the agency relation standard, the Court concluded employers are always liable "when a supervisor takes a tangible employment action against the subordinate." Id. The Court considered a tangible employment action to be "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Id. at 761. The Court's rationale for holding employers vicariously liable for supervisor harassment resulting in a tangible employment action is straightforward: "When a supervisor makes a tangible employment decision, there is assurance the injury could not have been inflicted absent the agency relation." Id. at 761-62. However, the Court observed the question of "[w]hether the agency relation aids in commission of supervisor harassment which does not culminate in a tangible employment action is less obvious." Id. at 763.

When considering employer liability for supervisor harassment with no tangible employment action–as we confront in this case–the Court recognized agency

principles are only part of the liability equation.  See id. at 764.  The Court also acknowledged "Title VII is designed to encourage the creation of antiharassment policies and effective grievance mechanisms.  Were employer liability to depend in part on an employer's effort to create such procedures, it would effect Congress' intention to promote conciliation rather than litigation in the Title VII context, and the EEOC's policy of encouraging the development of grievance procedures."  Id. (citations omitted).  The Court also recognized that, "[t]o the extent limiting employer liability could encourage employees to report harassing conduct before it becomes severe or pervasive, it would also serve Title VII's deterrent purpose."  Id.

Balancing "agency principles of vicarious liability" and "Title VII's equally basic policies of encouraging forethought by employers and saving action by objecting employees," the Court announced its holding:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, which comprises two necessary elements: (a) that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.

Id. at 764-65; Faragher, 524 U.S. at 807.  The Court accentuated that "[n]o affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."  Ellerth, 524 U.S. at 765; Faragher, 524 U.S. at 808; see also Pa. State Police v. Suders, 124 S. Ct. 2342, 2352 (2004) (recognizing Ellerth and Faragher, which govern employer liability for supervisor sexual harassment, "delineate[d] two categories of hostile work environment claims: (1) harassment that

'culminates in a tangible employment action,' for which employers are strictly liable, and (2) harassment that takes place in the absence of a tangible employment action, to which employers may assert an affirmative defense") (citation omitted).

In his dissent, Justice Thomas charged the Court with "manufactur[ing] a rule that employers are vicariously liable if supervisors create a sexually hostile work environment, subject to an affirmative defense that the Court barely attempts to define." Ellerth, 524 U.S. at 766 (Thomas, J., dissenting). Justice Thomas also stated that the Court's failure to explain how employers can use the newly crafted defense "provides shockingly little guidance about how employers can actually avoid vicarious liability," id. at 773, "ensuring a continuing reign of confusion in this important area of the law." Id. at 771. Justice Thomas predicted that "employer liability very well may be the rule," which Congress clearly did not intend. Id. at 773-74. Finally, Justice Thomas forecasted "more and more litigation to clarify applicable legal rules in an area in which both practitioners and the courts have been begging for guidance." Id. at 774. McCurdy's case fulfills the prophecy.

McCurdy first argues the ASP failed to conduct a proper investigation and take proper remedial action, which would negate the first element of the Ellerth/Faragher defense. We exhaust little effort to dispose of this hollow contention. It is indisputable that McCurdy suffered absolutely no harassment from Sergeant Hall–or anyone else at the ASP–after she complained the same day she was allegedly harassed. Although the ASP was unable to anticipate and prevent Sergeant Hall's harassment of McCurdy, the ASP's anti-harassment policy worked once the ASP was alerted to Sergeant Hall's offensive conduct. Immediately after McCurdy reported Sergeant Hall's offensive behavior, the ASP took all steps that could reasonably be expected of an employer promptly to investigate the report, insulate McCurdy from further offensive conduct, and take appropriate corrective measures. McCurdy's arguments to the contrary are without merit and completely lack support in the record. To conclude the ASP failed promptly to correct Sergeant Hall's harassing behavior

-13-

would require us to suspend logic and reason. We conclude the ASP did exactly what the Supreme Court's affirmative defense requires an employer to do–maintain an appropriate anti-harassment policy and promptly implement that policy when an employee complains about harassing conduct.

McCurdy also contends the Ellerth/Faragher affirmative defense is unavailable to the ASP because it cannot prove the necessary second element, i.e., that McCurdy "unreasonably failed to take advantage of any preventive or corrective opportunities provided by the [ASP]." Without expressly advocating strict liability against the ASP for Sergeant Hall's behavior on July 5, McCurdy's argument, when boiled down, leads inevitably to strict liability for the ASP. However, Meritor's prohibition of automatic employer liability for supervisor sexual harassment, Meritor, 477 U.S. at 71-72, is still the rule.[8]

Strict adherence to the Supreme Court's two-prong affirmative defense in this case is like trying to fit a square peg into a round hole. We will not tire ourselves with such an exercise. Instead, we critically ask whether Title VII envisions strict employer liability for a supervisor's single incident of sexual harassment when the employer takes swift and effective action to insulate the complaining employee from further harassment the moment the employer learns about the harassing conduct.

As we answer this question, we begin with the obvious understanding that the Supreme Court, when it used the Ellerth and Faragher facts to craft the two-prong affirmative defense to strict liability, was not addressing an employer who takes swift and effective action the minute it learns of a single incident of supervisor sexual harassment. Judicially adopted defenses should not be viewed in a vacuum and blindly applied to all future cases. Instead, we should analyze these defenses based

---

[8]In Faragher, the Supreme Court declared, "Meritor's statement of the law is the foundation on which we build today." Faragher, 524 U.S. at 792.

on the unique facts involved in the cases in which courts adopt the defenses. In Ellerth and Faragher, the Supreme Court confronted cases involving repeated incidents of supervisor sexual harassment. In contrast, we are confronted with McCurdy's case involving a single incident of alleged supervisor sexual harassment. Therefore, we ask whether the Supreme Court intended the Ellerth/Faragher affirmative defense to apply to this situation, or whether the Supreme Court intended employers in such situations to be strictly liable.

The Supreme Court in Meritor held that employers are not strictly liable for supervisor sexual harassment in the workplace. The Court's most recent discussions of employer liability for supervisor harassment reaffirmed Meritor's no strict liability standard, except in cases where an employee can show she suffered a tangible employment action. We conclude the Supreme Court, in crafting the Ellerth/Faragher affirmative defense, did not change course in sexual harassment jurisprudence by holding employers strictly liable for single incidents of supervisor sexual harassment. Therefore, we hold the ASP is entitled to a modified Ellerth/Faragher affirmative defense, despite the ASP's inability to prove the second element.[9]

---

[9]In addition to arguing the second prong of the affirmative defense does not apply to a case involving a single incident of supervisor sexual harassment, the ASP also argues it has established the second prong. Specifically, the ASP contends McCurdy admitted in her summary judgment brief that Sergeant Hall had inappropriately touched her breast before July 5 when he hugged her over the death of a colleague, but McCurdy failed to inform the ASP. Thus, the ASP contends McCurdy unreasonably failed to take advantage of the ASP's anti-harassment policy, entitling the ASP to summary judgment. Because we conclude the second prong of the affirmative defense does not apply to the facts of this particular case, we do not address the ASP's argument. We again note McCurdy alleged in her complaint and testified in her deposition only about the one incident on July 5, 2002, as the basis for her claim of sexual harassment.

It is a fair question to ask who should bear the responsibility for a single incident of supervisor sexual harassment, an innocent employee like McCurdy or an employer like the ASP who effectively stops the harassment after it learns about it. One could argue the ASP should bear the risk of supervisor sexual harassment, as opposed to the innocent McCurdy. However, the Court has rejected this theory of vicarious liability. See Faragher, 524 U.S. at 796-801. To hold the ASP liable for Sergeant Hall's unauthorized acts would be to expand the scope of strict liability under Title VII. Expanding strict liability principles is better left to the Supreme Court, which has consistently held employers are not strictly liable for sexual harassment in the workplace absent a showing of tangible employment action.

The Ellerth/Faragher affirmative defense protects employers in harassment cases in which an employee fails to stop the harassment by using the employer's effective anti-harassment policy. The underlying theme under Title VII is employers should nip harassment in the bud. That is exactly what happened here. In this case, McCurdy admittedly suffered no tangible employment action.

To reach a conclusion that the affirmative defense is unavailable in single incident cases in which the employee takes advantage of preventative or corrective opportunities provided by the employer and the employer thereafter takes swift and effective action to avoid further offensive conduct stands the underlying policy behind the affirmative defense on its head. Denying such an employer an opportunity to avail itself of the affirmative defense, when the employer has done all that an employer could reasonably be expected to do to avoid and remedy the offending behavior, effectively creates strict liability for employers in a single incident case–contrary to the Supreme Court's holding in Meritor. To hold otherwise would make the promise of an affirmative defense in single incident cases not involving a tangible employment action illusory–the pragmatic result would be to hold effective employers like the ASP strictly liable for all single incidents of supervisor harassment, while allowing other employers an affirmative defense for multiple and

ongoing incidents of supervisor harassment. We decline the invitation to reach what appears to us to be an absurd result.

For example, if Sergeant Hall had engaged in his harassing conduct for months and McCurdy had not reported him, the ASP would not be liable for Sergeant Hall's harassment. However, because McCurdy felt comfortable to report Sergeant Hall's conduct within hours of it occurring, and the ASP quickly took action to assure Sergeant Hall never treated McCurdy in a distasteful manner again, the ASP would otherwise bear full responsibility and liability for Sergeant Hall's single, unauthorized incident of harassment. Another scenario drives this bewildering result home. Had the ASP done absolutely nothing when McCurdy reported Sergeant Hall's conduct, and Sergeant Hall had not harassed McCurdy again, the ASP would be treated the same way it would be treated now–strictly liable. We cannot fathom how a court could logically follow a sound analytical path to reach these seemingly absurd results.

Even if the Ellerth/Faragher affirmative defense does not apply to this case, we still could not faithfully follow Supreme Court precedent if we held the ASP strictly liable for Sergeant Hall's conduct. Instead, the Supreme Court has clearly directed courts to follow agency principles to determine employer liability. Applying agency principles to determine the ASP's liability, we would still conclude the ASP is shielded from liability for swiftly and effectively ending McCurdy's harassment. Sergeant Hall had no authority, apparent or otherwise, to sexually harass McCurdy. This observation is buttressed by the ASP's effective anti-harassment policy, McCurdy's near instantaneous complaint of the harassment, and the ASP's swift and effective response to the harassment complaint.

We also note this is not a typical supervisor harassment case. There is absolutely no evidence Sergeant Hall had the power to hire or fire, or set work schedules or pay rates for McCurdy or anyone else. Sergeant Hall was as close to a

co-worker as a "supervisor" could get. Thus, no court could conclude Sergeant Hall was aided in the agency relation to harass McCurdy.

Finally, the ASP could not be liable under a negligence theory, because once McCurdy complained of Sergeant Hall's conduct, the ASP shielded McCurdy from further harassment by taking swift and effective action against Sergeant Hall to assure he never again harassed McCurdy.

The Eighth Circuit has made a cursory pass at whether the Ellerth/Faragher affirmative defense applies to cases involving a single incident of supervisor sexual harassment. In Todd v. Ortho Biotech, Inc., 175 F.3d 595, 597-98 (8th Cir. 1999), the court pondered whether the Ellerth/Faragher affirmative defense applies to cases involving a single incident of sexual assault committed by a supervisor. The court recognized that the judicially created "affirmative defense was adopted to avoid 'automatic' employer liability and to give credit to employers who make reasonable efforts to prevent and remedy sexual harassment." Id. at 598 (citing Faragher, 524 U.S. at 803-07). The court further realized the affirmative defense was "adopted in cases that involved ongoing sexual harassment in a workplace," noting the defense "may not protect an employer from automatic liability in cases of single, severe, unanticipatable sexual harassment unless, for example, the harassment does not ripen into an actionable hostile work environment claim until the employer learns that the harassment has occurred and fails to take proper remedial action." Id.; see Indest v. Freeman Decorating, Inc., 164 F.3d 258, 265 (5th Cir. 1999) (recognizing "Ellerth and Faragher do not, however, directly speak to . . . a case in which the plaintiff quickly resorted to [the employer]'s policy and grievance procedure against sexual harassment, and the employer took prompt remedial action") (Jones, J.). Although the court in Todd intimated our analysis should focus on whether the single incident

of harassment constituted actionable sexual harassment, we instead directly address employer liability for the single incident of supervisor harassment.[10]

Blindly following the Ellerth/Faragher affirmative defense in this case would actually develop a new rule never sanctioned by the Supreme Court. The new rule could be stated as follows: If an employee suffers a tangible employment action at the hands of a supervisor or endures a single incident of supervisor harassment, the employer is strictly liable under Title VII, and only when an employee suffers no tangible employment action–but endures a supervisor's consistent and repeated harassment–will the employer be afforded the shelter provided by the affirmative defense.

---

[10]Judge Richard S. Arnold, writing separately in Todd, recognized that the judicially created affirmative defense "is not always a complete defense to liability[, but] can also be a defense to damages only." Todd, 175 F.3d at 599 (citing Ellerth, 524 U.S. at 764-65) (Arnold, J. Richard S., concurring in the judgment). Judge Arnold posited that, "[i]f a supervisor abuses his authority to commit a sufficiently severe act of harassment, the employer's affirmative defense, if established, should serve to reduce the damages, but I don't understand why it should always erase the tort completely." Id. Perhaps this could be a workable rule–an employer is liable for a single incident of supervisor harassment, but the employer's liability for damages is reduced, or eliminated, based on the employer's swift and effective response to the employee's harassment complaint. For such a rule, we believe further guidance from the Supreme Court is required. Given the Supreme Court's discussion of employer liability from Meritor to Ellerth and Faragher, we glean an overriding theme that employers who have effective anti-harassment policies and take swift remedial measures when put on notice of harassing conduct have complied with Title VII, except where a supervisor takes a tangible employment action against the harassed employee, the employer negligently allows the harassment to continue, the supervisor uses apparent authority to harass an employee, or the supervisor is aided in the harassment by the agency relation. If these exceptions are absent, and an employer resolves a workplace issue of harassment at the first opportunity to do so, federal courts should not intervene to inform the employer it is still a discriminating employer in violation of Title VII.

We conclude by applauding the ASP for its swift and effective response to McCurdy's report of the single incident of sexual harassment. Title VII forbids sexual harassment in the workplace, and the ASP followed this prohibition by having an appropriate anti-harassment policy and pursuing that policy when confronted with McCurdy's allegations of harassment.[11]

## III.   CONCLUSION

For the foregoing reasons, we affirm the well-reasoned decision of the district court granting summary judgment to the ASP.

MELLOY, Circuit Judge, dissenting.

I must respectfully dissent from the majority opinion in this case.

The district court and the majority opinion both assume that the facts of this case create a jury question as to whether there is actionable sexual harassment. Although I believe that is a very close call, for all the reasons set forth in footnote number 6 of the majority opinion, my analysis proceeds on the same assumption.

I do not believe that the majority opinion can be squared with the Supreme Court decisions in Faragher v. City of Boca Raton, 524 U.S. 775 (1998), and Burlington Industries, Inc. v. Ellerth, 524 U.S. 742 (1998), as well as our own precedents interpreting those two Supreme Court decisions. It is my reading of those

---

[11]We note McCurdy's reply brief asks that we "not condone [Sergeant Hall's] behavior in the State of Arians." If McCurdy's ill-conceived reference to the State of Arkansas as the "State of Arians" was intentional, we disapprove of this type of behavior by an officer of this court. The reference is neither professional nor funny, and does not advance McCurdy's case. If McCurdy's "State of Arians" reference was inadvertent, we caution counsel to review more carefully his brief before submission to this court.

cases that the only defense to liability by an employer for supervisor harassment is to establish both prongs of the affirmative defense set forth in Faragher and Ellerth. That is, the employer must show that the employer exercised reasonable care to prevent and correct promptly any sexually harassing behavior and the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer. See Burlington Industries, Inc. v. Ellerth, 524 U.S. at 765; Faragher v. City of Boca Raton, 524 U.S. at 807-08. In this case, the evidence clearly shows that the Arkansas State Police met the first element of the two prong test. It had a policy and took prompt and effective remedial action against Mr. Hall. Like the majority, I applaud the ASP for its swift and effective response to McCurdy's report of the sexual harassment. However, because ASP cannot establish the second prong of the Ellerth/Faragher affirmative defense, I must conclude that it still remains liable if a jury ultimately concludes that Hall's conduct does rise to the level of sexual harassment.

It may be that the Supreme Court did not have a situation like this case in mind when it decided Faragher and Ellerth. In many, if not most cases, a single incidence of harassment, or as in this case, incidences that occur over less than an hour's time, will not normally rise to the level of being sufficiently severe and pervasive to constitute actionable harassment. However, I cannot read anything in Ellerth/Faragher that creates an exception to the two prong affirmative defense for those cases of single incident harassment that do rise to the level of actionable sexual harassment. As I read the Supreme Court cases, if there is supervisory harassment, whether it is a single or multiple incident, and the employer cannot prove the plaintiff employee unreasonably failed to take advantage of any corrective opportunities, the employer will be liable, regardless of how effective and prompt its remedial action might have been.

The district court found that ASP had established the Ellerth/Faragher affirmative defense as a matter of law and relied primarily on the reasoning of a

-21-

single member of the Fifth Circuit in <u>Indest v. Freeman Decorating, Inc.</u>, 164 F.3d 258 (5th Cir. 1999) (<u>Indest I</u>). The district court recognized that <u>Indest I</u> is not binding precedent in the Fifth Circuit because it represents the views of only a single member of the three-judge panel. The other two members of the panel concurred in the judgment only. In <u>Indest v. Freeman Decorating, Inc.</u>, 168 F.3d 795 (5th Cir. 1999) (<u>Indest II</u>), one of the concurring judges, Judge Wiener, wrote a separate, concurring opinion and specifically rejected <u>Indest I</u>'s reasoning insofar as it modified the Supreme Court's clear pronouncement of the twin elements of the <u>Ellerth/Faragher</u> affirmative defense. Judge Wiener characterized the Supreme Court's <u>Ellerth</u> and <u>Faragher</u> opinions as "remarkably clear." <u>Id.</u> at 796. He stated, "Under the <u>Ellerth/Faragher</u> rubric, an employer is vicariously liable for a supervisor's actionable hostile environment sexual harassment of an employee unless the employer can prove *both* elements of the one and only affirmative defense now permitted by the Court." <u>Id.</u> (footnote omitted).

Similarly, the EEOC takes the position that the <u>Ellerth/Faragher</u> defense requires proof of both elements, even though this result may appear "harsh to a law abiding employer." EEOC Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors, June 18, 1999. This result, however, is tempered with the requirement that harassing conduct be severe and pervasive, because "[i]n most circumstances, if employers and employees discharge their respective duties of reasonable care, unlawful harassment will be prevented and there will be no reason to consider questions of liability." <u>Id.</u>

I believe the cases from our court interpreting the <u>Ellerth/Faragher</u> affirmative defense, lend further support for my position. In <u>Moisant v. Air Midwest, Inc.</u>, 291 F.3d 1028, 1030 (8th Cir. 2002) the court discussed circumstances under which an employer may be held liable under Title VII for the acts of a supervisory employee whose sexual harassment created a hostile work environment. The court held that an employer is vicariously liable unless the employer can affirmatively show, among

other things, that the employee unreasonably failed to take advantage of any preventive or corrective opportunities that may have been provided. The court went on to state:

> Although, Air Midwest acted promptly to provide appropriate remedies for the events of which Ms. Moisant complained, that does not immunize them from the vicarious liability that Faragher imposes. In granting judgment as a matter of law, perhaps the district court had in mind the rule that prompt remedial action will shield an employer from liability when the complaint against it is bottomed on acts committed by a plaintiff's co-worker rather than a supervisor. See e.g., Bailey v. Anchor Packaging, 216 F.3d 720, 720 (8th Cir. 2000) (per curiam). But that is not this case. The present case was tried, at least partly, on the theory that Mr. Stillwell was Ms. Moisant's supervisor, and there was ample evidence in the record that he was her supervisor as that term is defined in the relevant cases. See Faragher, 524 U.S. at 807, 118 S. Ct. 2275; see also Todd v. Ortho Biotech, Inc., 175 F.3d 595, 598 (8th Cir. 1999). It follows that the district court erred with respect to Ms. Moisant's hostile environment claim and that the court's judgment must in this respect be reversed.

Id. at 1031. Granted, Moisant dealt with the situation involving three incidents of sexual harassment, two of which were reported to the employer. However, I see nothing in Moisant which would indicate that a different result would obtain if there had only been one incident of sexual harassment that was promptly reported to the employer.

In sum, I must respectfully dissent from the majority opinion. Unlike the majority, I believe that Judge Richard S. Arnold correctly analyzed the Ellerth/Faragher affirmative defense in his concurrence in Todd v. Ortho Biotech,

<u>Inc.</u>, 175 F.3d 595, 599-600 (8th Cir. 1998) (Arnold, Richard S., concurring). Like Judge Arnold, I believe the taking of prompt and effective remedial action may mitigate damages; however, it does not create a complete defense to liability.

_____